VERMONT SUPERIOR COURT

32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION



| In Re: Lumbra Farms Medium Farm Operation (MFO) Denial. | Docket No. 58-5-19 Vtec |
|---|---|

## Decision on Cross-Motions for Summary Judgment

Pleasant Valley Farms of Berkshire, LLC ("PVF" or "Appellant") is the owner and operator of several dairy farms in the northwestern Vermont towns of Berkshire, Richford, St. Albans, and Enosburg, including the Lumbra Farm, which is located at 1567 Skunk Hollow Road in Berkshire, Vermont ("Lumbra Farm"). When the Vermont Agency of Agriculture, Food & Markets ("AAFM" or "the Agency") denied PVF's Notice of Intent to Comply ("NOIC") with the 2018 Medium Farm Operations General Permit ("2018 MFO GP") concerning its operation of the Lumbra Farm, and instead determined that that the Lumbra Farm should be governed by the rules, regulations and statutes covering large farm operations ("LFO"), PVF filed a timely appeal with this Court.[1]

Appellant then filed its Statement of Questions, listing five legal issues to be addressed in this appeal. As a result of the Court granting AAFM's motion to clarify four of PVF's Questions, the legal issues presented and modified are now as follows:[2]

---

[1] This appeal was preceded by an earlier appeal, involving the same parties, referencing the same farm, and similar legal issues. *See* In re Pleasant Valley Farms Permit MFO, No. 26-3-18 Vtec slip op. at 2-5 (Vt. Super. Ct. Envtl. Div. Feb. 20, 2019) (Durkin, J.). After several status conferences and pre-trial motions that were addressed by this Court, the parties filed a stipulation, requesting that the Court dismiss that first appeal, without prejudice, so that the same or similar legal issues could be addressed in this second appeal. The Court accepted the parties' stipulation and dismissed the first appeal on September 12, 2019. This second appeal was filed on May 8, 2019.

Both appeals were initially assigned a caption using the name of PVF, as owner and operator of the Farm, but we later changed the caption in the second appeal to reference the Lumbra Farm, at the request of Appellant. *See* In re Lumbra Farm MFO Denial, No. 58-5-19 Vtec (Vt. Super. Ct. Envtl. Div. Dec. 3, 2020) (Durkin, J.) (changing the name.)

[2] The modifications to Questions 1, 2, 4, and 5 are detailed in the Court's January 31, 2020, Entry Order, granting AAFM's motion to clarify PVF's Statement of Questions.

1. Whether the Lumbra Farm[3] satisfied the definition of a Medium Farm pursuant to 6 V.S.A. § 4857(2)?

2. Whether the Lumbra Farm satisfied the definition of a Medium Farm pursuant to Subchapter III of the Rules?

3. Should the term "designed to house" found in 6 V.S.A. § 4851 [defining an LFO] be interpreted to mean the overall size of the structure, irrespective of the intended and actual use of the structure or number of animals present in the structure?

4. Whether the barn on the Lumbra Farm is designed to house more than 699 mature dairy animals, 300-999 cattle or cow/calf pairs such that a Large Farm Operation permit was required pursuant to 6 V.S.A. § 4851?[4]

5. Does PVF's manure spreading practices rise to the level of being a "common waste disposal system" as set forth in 6 V.S.A. § 4851(b) such that an LFO Permit was required?[5]

Presently before the Court are competing motions for summary judgment. AAFM filed the first summary judgment motion, asserting that the State is entitled to summary judgment as a matter of law on all of the legal issues raised in Appellant's Statement of Questions, as modified by this Court's January 31, 2020, Entry Order. Appellant filed its cross-motion for summary judgment, asserting that it is entitled to summary judgment on all legal issues presented. Each party has filed statements of undisputed facts, statements of disputed facts, affidavits,[6] legal memoranda in opposition to the respective motions, and reply memoranda in support of their respective motions.

---

[3] For the purpose of clarity, "Lumbra Farm" is substituted throughout our recitation here of Appellant's Statement of Questions where the phrase "Pleasant Valley Farm" was originally used.

[4] We have revised this Question to address its somewhat awkward phrasing. We do not understand that our revision changes the legal issue presented.

[5] In its filing of March 12, 2021, PVF asserts a slightly different wording of its Statement of Questions than represented in its actual Statement of Questions, filed on May 28, 2019. PVF also asserts that its Statement includes a sixth Question that is not contained in its May 28, 2019, filing, or any subsequent filings discovered by the Court. Our recitation above is an exact replication of PVF's Statement of Questions, filed May 28, 2019, and as modified by this Court's Entry Order of January 31, 2020; PVF's original Statement of Questions contains no sixth Question.

[6] Both AAFM and PVF have submitted statements or affidavits that do not contain an acknowledgement before a notary public. Affidavits and other documents that previously needed to contain an acknowledgement before a notary public in order to be admissible and considered on summary judgment may now be filed with a declaration of veracity instead. Initially suspended only temporarily by Administrative Order 49, ¶ 17(a) (effective April 6, 2020) and Act 95 (S. 114), § 7 (signed and effective April 28, 2020) in response to the COVID-19 pandemic, the change to the notary requirement has since been codified by the recent amendment of Civil Rule 11(e) (effective February 14, 2022) (incorporating the language of Act 95) (stipulating that except when required by statute, "wherever these rules require the filing of a statement made under oath, an affidavit, or a notarized document, a party may file a document with the following [declaration] inserted above the signature and date . . . "). V.R.C.P. 11(e)(1). The court therefore considers here the statements filed by the parties that contain either notarization or the appropriate declaration.

After all these filings were completed, the pending motions were added to the Court's under advisement list on April 27, 2021. Other responsibilities have delayed our completion of this Decision on the pending cross-motions. The undersigned regrets those delays and offers his apologies to the parties and their legal counsel.

The State of Vermont and its subdivision, AAFM, are represented in these proceedings by Assistant Attorneys General Thea Schwartz, Melanie Kehne, and Ryan Kane. Pleasant Valley Farms, LLC, its principals—Mark and Amanda St. Pierre—and its subsidiaries, including the Lumbra Farm, are represented by Attorneys Claudine C. Safar, Joan W.D. Donahue, Ebenezer Punderson, and Christian Chorba.

## Factual Background

We recite the following background and procedural history, which we understand to be undisputed unless otherwise noted, based on the record now before us and for the sole purpose of deciding the pending motions. The following are not specific factual findings with relevance outside of this summary judgment decision. *See* Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (citing Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.)).

1. AAFM is a subdivision of the State of Vermont that is charged with regulating small, medium, and large-sized farming operations.

2. Pleasant Valley Farms of Berkshire, LLC ("PVF") owns and operates several dairy farms in the four northwestern Vermont towns of Berkshire, Richford, St. Albans, and Enosburg. One of its farms, known as the Pleasant Valley Farm in Berkshire, Vermont, is permitted by AAFM as a large farm operation and is subject to LFO Permit #2000-01-A9.

3. PVF purchased another one of its farms, known as the Lumbra Farm, in 2016. The Lumbra Farm is located at 1567 Skunk Hollow Road in Berkshire, Vermont.

4. At the time of PVF's purchase of the Lumbra Farm, that Farm was operated and certified as a small farm operation. PVF's original intent for the Lumbra Farm was to convert its operations to an organic dairy farm, but market conditions and other factors made that plan untenable.

5. There is some suggestion in AAFM's legal memoranda that PVF also initially represented, in another permit application, that it intended to operate the Lumbra Farm as part of the Pleasant Valley Farm, which was already subject to LFO Permit #2000-01-A9. The Court was unable to find this PVF representation in an exhibit that has thus far been submitted to the Court in this appeal.

6. PVF then determined that it wished to expand the barn at the Lumbra Farm, apparently as a separate entity from the Pleasant Valley Farm, so that its facilities could be operated as a "transition barn" which was to be used to house cows that are expected to calve within the next sixty days or have calved within the last thirty days, as well as bred heifers and recently born calves. The purpose of a transition barn is to reduce crowding of such animals, decrease stress, protect vulnerable cows, and help encourage a healthier, more productive, and more humanely managed herd.

7. The expanded barn has a "freestall" layout, in which cows are housed in several rectangular pens on each side of a central feed alley, with stalls inside each pen. The pens also have a concrete scrape alley with an automated scraper that pushes manure into a collection pit. The stalls are open and cows can enter at their leisure, head-first so that manure falls into the scrape alley behind the stall.

8. When PVF first purchased the Lumbra Farm, its barn enclosed just under 15,000 square feet of space.

9. After its purchase and during the approximately 24 months thereafter, PVF expanded and significantly added to the Lumbra Farm barn. In terms of gross enclosed area, the expanded barn now encompasses about 104,508 square feet of enclosed area, which is the equivalent of just under 2.4± acres of land.

10. The Lumbra barn has several internal components, including animal stalls, one or more milking parlors, alley ways between the stalls and other areas, feed alleys, squeeze shoots, manure scraping areas, and general "dead" space or other areas not dedicated to a specific use.

11. PVF chose not to notify AAFM of its planned or construction-in-progress barn expansion and other improvements at the Lumbra Farm. There was no prior request to AAFM on PVF's behalf to seek a determination of whether its planned expansion would be regarded by AAFM as a medium or large farm operation under the applicable regulations, rules, and statutes. There was also no prior disclosure of the plans, drawings, or design of the to-be-expanded Lumbra Farm barn prior to construction beginning. Rather, in the Fall of 2017, AAFM received a public records request from a third party concerning the expansions at the Lumbra Farm. In response to that request, AAFM initially conducted a "drive-by" investigation, which confirmed that the barn expansion and other improvements had or were in the process of being constructed.

12. In response to AAFM's inquiry, Mrs. St. Pierre confirmed that PVF was constructing improvements at Lumbra Farm. The St. Pierres initially denied AAFM officials the permission to access the Lumbra Farm, but later agreed to grant access.

13. Shortly before AAFM staff's scheduled inspection, PVF submitted a Notice of Intent to Comply with AAFM's 2012 Medium Farm Operation General Permit (MFO GP) for Lumbra Farm. A General Permit, as the name suggests, is not specific to a particular farm, but rather sets forth a set of standards that an animal feeding operation may aver it will comply with in order to protect water quality. AAFM must verify and approve of that compliance. 6 V.S.A. § 4858.

14. On January 9, 2018, AAFM staff inspected the Lumbra Farm, including the outside areas of its barn. However, PVF representatives denied AAFM officials the requested access to the interior spaces of the expanded Lumbra barn on this date.[7] As a result of further negotiations, PVF consented to AAFM officials, including the Agency Dairy Chief and the Agricultural Water Quality Supervisor, inspecting the interior of the Lumbra barn. Agency staff conducted a second inspection of the property on March 21, 2018.

15. During this second inspection, the Dairy Chief observed that there were 445 mature dairy cows, 234 bred heifers, and 196 other heifers in the expanded barn during their inspection. Mr. St. Pierre later advised that at about the time of this second visit, the Lumbra barn was housing 551 mature dairy cows, 277 youngstock or heifers, and an additional number of bull calves that amounted to no more than 20.

16. PVF noted that the Dairy Chief, during their March 21, 2018, visit, did not use a hand "clicker" when counting the animals in the Lumbra Farm barn, but rather noted her counts on a piece of paper. PVF asserts that the methodology used by the Dairy Chief "is not a sound or reliable methodology and resulted in a wholly inaccurate cow count."

17. Also, during this second inspection, the Agricultural Water Quality Supervisor took measurements of the interior of the barn and recorded GPS points to help determine the barn's dimensions and precise placement. PVF disputes the reliability of methodology that the Agricultural Water Quality Supervisor used in both cases.

18. With the measurements and GPS points taken during the inspection, along with estimates provided by the St. Pierres and aerial imagery, AAFM used AutoCAD software to estimate the square footage of two areas of the expanded barn. AAFM calculated (1) that the area of the expanded barn containing stalls and spaces in which animals can feed and defecate was 73,658 square feet and (2) that

---

[7] In its Statement of Disputed Facts, filed with the Court on March 12, 2021, PVF advised that Mrs. St. Pierre was concerned by the officials' "last minute request . . . without prior notice. [She further stated that d]ue to the complexity of a dairy barn operation, allowing persons into the interior of a dairy farm barn can present unnecessary risks to a visitor and also interfere with farm operations." Id. at 3, ¶ 14.

the area of the expanded barn that does not contain the milking/holding and utility area, the pack area and associated feed alley, and the main feed area was 82,677 square feet.

19. PVF disputes the use of these numbers and their accuracy but does not provide much explanation as to why they may be inaccurate. PVF asserts that only about 28,305 square feet of the expanded barn are used for animal stalls.

20. At some point between the two visits or after the second visit, AAFM decided that to determine the number of mature dairy cows this as-built barn was designed to hold, they would rely on a publication from the University of New Hampshire that suggested a minimum amount of enclosed housing space per mature dairy animal. The publication suggested 75-100 square feet of enclosed space per animal. AAFM divided the square footage of the barn—using both the larger figure of 82,677 square feet, and the smaller figure of 73,658 square feet—by first the 75 square foot requirement and then the 100 square foot requirement, to determine the number of mature dairy cows this barn was designed to hold. In all cases, the number they came up with was larger than the threshold of 700 mature dairy cows beyond which a Large Farm Operation permit is required. PVF disputes the propriety of this methodology.[8]

21. During her March 21, 2018, visit, the Dairy Chief also counted the number of stalls at the expanded Lumbra barn; her count indicated a total of 1,198 stalls, including 567 stalls that were 53.4 inches wide (i.e.: capable for use by mature dairy cows) and 631 stalls that were 44.4 inches wide (i.e.: capable for use by heifers).

22. PVF has given differing estimates for the number of stalls that exist at present in the Lumbra Farm barn, ranging from 570 mature dairy cow stalls and 380 heifer stalls, per Mark St. Pierre's

_____

[8] In its Statement of Undisputed Material Facts and Motion for Summary Judgment, AAFM presents two further sets of calculations that it claims support the conclusion that the barn is "designed to house" more than 700 mature dairy cows. For these calculations, AAFM takes the 28,305 square feet, disclosed by PVF during discovery in this appeal as the area of the Lumbra barn used specifically for stalls, and divides it by two different estimates of the appropriate size for a stall for a mature dairy cow or special needs animal, one from Penn State University and one from the Dairy Council. However, these calculations had no bearing that we can find on the Agency's actual decision to deny coverage under the 2018 MFO GP, the decision that is here under appeal; they instead appear to be "post-hoc justification[s]" for that decision. Conservation Law Found. v Burke, 162 Vt. 115, 128 (1993). Because "the Agency decision must stand or fall on the reasons given contemporaneously with the decision and not a later revision of those reasons," id., we do not give these explanations much weight in our deference analysis, see supra at 17. That said, the Agency may, of course, introduce new legal theories and new evidence as to those theories in this de novo appeal, see 6 V.S.A. § 4861, V.R.E.C.P. 5(g) (establishing this as a de novo appeal); In re Northeast Materials Group, LLC, No. 35-3-13 Vtec, slip op. at 3 n.5 (Vt. Super. Ct. Envtl. Div. July 02, 2013) (Walsh, J.) ("As in de novo municipal appeals, parties in a de novo appeal of a District Commission decision before this Court are not limited in their *legal arguments* to those raised in the proceedings below.") (emphasis added).

deposition,[9] to 614 mature dairy cow stalls and 309 stalls for heifers, per PVF's responses to supplemental interrogatories. PVF's assertions as to the widths of the stalls are similar to AAFM's, approximating 54 inches for mature cow stalls and 44 inches for heifer stalls.

23. Frankly, having reviewed the parties' respective filings over the last several months, it is not at all clear to the Court how many stalls currently exist in the Lumbra barn. The Court is also uncertain as to the relevancy of an estimate of how many stalls are not presently, but could be located in a reconfigured barn sometime in the future. We address this relevancy issue in the section of our legal analysis that discusses the statutory term "designed to house" that is used in defining the triggers for a large farm operation. 6 V.S.A. § 4851(a).

24. The stalls at the Lumbra barn are delineated in a conventional manner, by using rigid piping that is welded or bolted in place to form each stall. This piping is secured, but (with some difficulty) could be moved or realigned.

25. The barn foundation is made of poured concrete and metal rebar reinforcement, with concrete curbs to delineate the different areas of the barn, such as the stall areas, milking parlors, feed areas, and defecating and manure collection areas. These concrete curbs are substantial and could be removed, though with some degree of difficulty and expense as it would likely require jackhammering and pouring new concrete.

26. In between their two inspections, and in response to PVF's application for coverage for Lumbra Farm under the 2012 MFO GP, the Agency denied coverage by its letter to PVF of February 19, 2018.

27. PVF timely appealed that denial of coverage to this Court; that appeal was captioned as In re Pleasant Valley Farms Permit MFO and assigned the docket number of 26-3-18 Vtec.

28. While that appeal was pending, the Agency updated its regulations concerning general permits for medium farm operations. Those updated regulations govern what is now referred to as the 2018 MFO GP.

29. PVF thereafter filed a NOIC with the 2018 MFO GP for the Lumbra Farm. By letter dated April 23, 2019, the Agency denied coverage under the 2018 MFO GP. In that letter, the Agency advised that PVF was required instead to obtain coverage under the statutes, regulations and rules governing LFOs, as it had determined that the expanded barn was designed to house more than the

---

[9] Mr. St. Pierre stated that there were roughly 950 total stalls, of which 570 were built for mature dairy cows, leaving a remainder of 380 that would be for heifers.

threshold number of animals for an LFO permit, and that manure from the Lumbra Farm had been spread on the fields of the Pleasant Valley Farm, its existing LFO. The Agency further advised that PVF had been required to obtain an LFO permit prior to the barn expansion and prior to the comingling of waste.

30. PVF filed a timely appeal of this denial of coverage of the Lumbra Farm under the 2018 MFO GP. After a revision proposed by PVF, this second appeal was captioned In re Lumbra Farm MFO Denial and was assigned docket number 58-5-19 Vtec, which is the appeal that is the subject of these proceedings.

31. After the filing of the second appeal, the parties stipulated that the first appeal should be dismissed, without prejudice to the legal claims raised by either party in the first appeal. The Court accepted the parties' request and issued an entry order dismissing that first appeal, without prejudice to either party's right to raise the legal issues from the first appeal in the already pending second appeal. *See* In re Pleasant Valley Farms Permit MFO, No. 26-3-18 Vtec (Vt. Super. Ct. Envtl. Div. Sept. 12, 2019) (Durkin, J.).

32. In addition to the barn expansion, PVF constructed a new earthen manure storage pit with a synthetic liner. The new manure pit exceeds one acre in size and involved more than an acre of earthen disturbance. The new manure pit has a total storage capacity of more than ten million gallons and an average storage usage of 7.4 million gallons.

33. PVF appears to concede that this new manure storage pit is much larger in size than the storage needed for the waste generated by the animals currently occupying the Lumbra Farm barn. PVF asserts that it caused the storage pit to be built much larger than presently needed for the Lumbra Farm animals because there was a general concern that the applicable regulations would be changed to increase the required manure storage for the number of animals that are or could be housed at the Lumbra Farm.

34. Although it is unclear from the parties' filings, there has been no evidence presented to date that this new manure storage pit is used or intended to be used to store manure produced by animals at any of the other PVF farms, other than those housed at the Lumbra Farm.

35. In the past, PVF has caused manure from the Lumbra Farm to be spread on fields used in the operations of one or more other PVF farms on at least one occasion. AAFM asserts that this practice was a system employed by PVF, such that PVF's manure spreading practices rise to the level of being a "common waste disposal system" as set forth in 6 V.S.A. § 4851(b). If this description proves to be

accurate, it may form an independent basis for concluding that PVF was required to obtain an LFO Permit for its Lumbra Farm operations.

36.     PVF denies that it has or is currently operating a common waste disposal system, as contemplated by 6 V.S.A. § 4851(b).  PVF notes that a portion of the fields utilized by its Pleasant Valley Farm were once owned by a member of the Lumbra family and used in that family's operation of the former Lumbra Farm.  PVF asserts that the spreading of manure from Lumbra Farm on other PVF farm fields was a mistake by PVF farm employees mis-identifying the respective farm fields.  The Court is left to wonder whether this manure spreading has continued or whether PVF has caused any changes to be made to its manure spreading.

## Legal Standard

We begin our analysis of the pending motions by repeating the well-worn maxim that we will grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  V.R.C.P. 56(a), which is made applicable to appeals before this Court through V.R.E.C.P. 5(a)(2).  We accept as true all of the nonmovant's allegations of fact, as long as they are supported by affidavits or other admissible evidence.  White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted).  In considering cross-motions for summary judgment, the Court considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences.  City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332.  With these standards in mind, we begin our legal analysis.

The legislative purpose for regulating small, medium, and large farm operations is "to ensure that agricultural animal wastes do not enter the [regulated] waters of this State."  6 V.S.A. § 4801.  These purpose provisions go on to caution that while "[a]ll farms [shall] meet certain standards in the handling and disposal of animal wastes, . . . the cost of meeting these standards shall not be borne by farmers only, but rather by all members of society, who are in fact beneficiaries."  We keep these purpose provisions in mind as we address the legal issues presented by PVF in this appeal.

## I.     The Overriding Question: what is meant by the term "designed to house"

A common term relevant to four of PVF's five Questions in its Statement of Questions, as well as the applicable statutes and regulations, asks what number of animals an existing or expanded farm facility is "designed to house."  See 6 V.S.A. § 4851; and LFO Rules Subchapter 4(A)(1).  Questions 1 through 4 concern whether the Lumbra Farm should be regulated as a Medium Farm

Operation ("MFO") or Large Farm Operation ("LFO"), which relates to whether the expanded barn is "designed to house" at least the threshold number of animals for an LFO. AAFM argues it is entitled to deference in its interpretation of the term and its determination that the expanded barn is designed to house LFO animal numbers.

We begin our analysis and lead up to our consideration of deference by attempting to identify the legislative intent in adopting the "designed to house" language, since our primary directive is to seek out and give meaning to the drafter's intent. *See* In re Wal-Mart Stores, Inc., 167 Vt. 75, 80 (1997) ("[deference] does not equate with mere judicial passivity in determining the propriety of [agency] interpretations of its own rules. . . [r]ather, as with all legislative schemes, we are guided by the intent of the Legislature, as evidenced by the statutes themselves") (internal quotations omitted) (citing In re Vitale, 151 Vt. 580, 583 (1989)); In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 20, 206 Vt. 430 ("It is well established that we defer to an agency's interpretation of a statute that the agency is tasked with interpreting, though we do not abdicate our responsibility to examine a disputed statue independently and ultimately determine its meaning") (internal citations removed).

In seeking out the drafters' intent, we first turn to the customary and established definitions of the terms that the Legislature used. *See* In re Williston Inn Group, 2008 VT 47, ¶ 14, 183 Vt. 621 (discerning intent "by reference to the plain meaning of regulatory language; other tools of construction are available to us should the plain-meaning rule prove unavailing"). We rely upon this well-established maxim of statutory interpretation for another important reason: so that both those who are to be regulated by such language, and the neighbors who may be impacted by the regulated use, are provided with an understandable threshold explanation of the regulatory requirements.

The term "design" has been defined in several ways that help guide our analysis. The online resource Dictionary.com explains that when used as a verb in reference to an object (such as here), "design" is defined as "(1) to prepare the preliminary sketch or the plans for (a work to be executed), especially to plan the form and structure[, such as] to design a new bridge [or] (2) to plan and fashion artistically or skillfully." Dictionary.com, design (online) (accessed Mar. 18, 2022).

Merriam-Webster's Collegiate Dictionary (10th ed.) provides a similar definition: "to create, fashion, execute, or construct according to plan . . .." Merriam-Webster's Collegiate Dictionary, design (10th ed. 2001).

Black's Law Dictionary (5th ed.) defines the term as "[t]o form plan or scheme of, conceive and arrange in mind, originate mentally, plan out, contrive. Also, the plan or scheme conceived in

mind and intended for subsequent execution . . .." Black's Law Dictionary, design (5th ed. 1979). *See also*, Black's Law Dictionary, design (11th ed. 2019) ("1. A plan or scheme. 2. Purpose or intention combined with a plan").

These definitions provide clear explanation for the term: all speak to forming a "plan." We find this explanation dispositive but difficult to apply to the evidence presented by the parties in this litigation, given that neither party has provided the Court with a specific or clearly understandable plan for the interior of Lumbra Farm barn. The depictions and descriptions of the expansion that do exist in the summary judgment record, whether lacking in detail, illegible, or disputed, fail to provide a complete understanding of the structure that could support a determination as to its current or intended use.[10] With no reliable plan or even a preliminary sketch of the full barn design presented by either party, we find it difficult to determine at this pre-trial stage what number of animals the Lumbra barn was "designed to house."

PVF has appealed from the Agency's denial of its application to be authorized to operate the Lumbra Farm as a medium-sized farm. As the applicant, PVF assumes the obligation to fulfill the initial burden of production and the ultimate burden of persuasion on the material facts that govern

---

[10] The parties did provide some estimates as to the size of the original Lumbra barn and the expanded barn. *See* Affidavit of Agricultural Water Quality Supervisor Maria Steyaart, attached as Exhibit A to the AAFM Statement of Undisputed Facts, filed with its Motion for Summary Judgment on November 9, 2020; Supplemental Responses to the State's Supplemental Requests to Admit, Interrogatories, and Requests to Produce, dated August 10, 2020, filed on November 9, 2020, as Exhibit D to AAFM's Statement of Undisputed Material Facts.

AAFM's measurements of the expanded barn are depicted on two sheets that are included as pages 8 and 9 to the Steyaart Affidavit, although separately marked as "Exhibit AA to Steyaart Aff." At the bottom of Exhibit AA are page numbers 5 and 6. We have not been made aware of the origins of these sheets or what may be contained in the first four pages that may have once accompanied them.

The narrative and depictions on these two pages of Exhibit AA do not include any interior measurements or details of the barn's design or its layout for housing cows. In fact, these depictions are very difficult to read or understand, given that the text within the depictions is not legible. On the second page of Exhibit AA, which depicts the exterior dimensions of the Lumbra barn, the viewer faces a quandary: while the depictions must be enlarged to be readable, the enlargement renders the text within the depictions completely unreadable. Additionally, PVF disputes the measurements in Ms. Steyaart's affidavit and the manner in which those measurements were taken. *See* PVF's Statement of Disputed Facts and Statement of Undisputed Facts, both filed on March 12, 2021.

PVF provided two sheets attached to the end of its *Supplemental Responses to the State's Supplemental Requests to Admit, Interrogatories, and Requests to Produce*, dated August 10, 2020, a copy of which was filed on November 9, 2020, as Exhibit D to AAFM's Statement of Undisputed Material Facts. The first of these last two sheets contains a hand-drawn depiction of the interior of the expanded Lumbra barn, with hand-written notations on some of the groupings of stalls, in some locations. We cannot discern whether this depicts the entire barn and see no notations of the total number of stalls or of the dimensions or total numbers of each type of stall; the individual numbers are in some places illegible. The second sheet includes a copy of a plan prepared by Bernard & Gervais, LLC, Surveyors, entitled "Barn Dimension Plan" that includes some, but not all exterior dimensions. This plan does not include a depiction of the stalls that are used to house the dairy animals. This plan also differs, in both dimensions and geometric shape, from the depictions of the Lumbra barn shown by AAFM in Exhibit AA to the Steyaart Affidavit.

our legal determinations in this appeal. Under the statutory scheme, an MFO "houses 200 to 699 mature dairy animals, 300 to 999 cattle or cow/calf pairs . . ." while an LFO permit is required in order to "construct a new barn, or expand an existing barn, designed to house more than 700 mature dairy animals, 1,000 cattle or caw/calf pairs . . ." or "operate a farm" with those numbers. 6 V.S.A. § 4857; 6 V.S.A. §§ 4851(a), (b). PVF asserts that the Lumbra barn neither "houses" nor is "designed to house" more than the threshold number above which an LFO permit would be required and that it is therefore entitled to summary judgment on the legal question that PVF should be certified to operate as an MFO pursuant to 6 V.S.A. § 4857(2).

PVF argues that the expanded barn should not be found to have been "designed to house" LFO numbers of animals because the "actual design, layout, and construction of the barn" do not allow for more cows than an MFO permit allows. Opposition to Agency's Motion for Summary Judgment and Cross-Motion for Summary Judgment at 40. AAFM, oppositely, argues that it does by interpreting "designed to house" according to a different set of metrics. Without so much regard to the barn's existing configuration, AAFM defines "designed to house" in terms of the expanded barn's "capacity or potential to house animals, which is based primarily upon its actual physical size and capacity." State's Motion for Summary Judgment at 15. While other factors may weigh on the determination, AAFM looks to physical size in terms of square footage as the main indicator of whether a barn is designed to house LFO numbers of animals.

In attempting to assist the Court in determining the definition of the term "designed to house," AAFM asserts that PVF suggests the term should be limited by the number of animals that are currently housed at the Lumbra barn. We do not understand that PVF has suggested such a narrow definition of the term. But it is important for this Court to state the obvious: whether suggested by PVF or not, we have discovered no legal foundation for limiting the definition of the term "designed to house" to only the number of animals that currently occupy a certain barn. While the number of animals currently in a barn may be relevant to the inquiry, it by no means provides us with a basis for deciding the maximum number of animals a barn is designed to house.

Our understanding based on the competent evidence provided thus far is that in a barn utilizing a so-called "freestall design," the number of stalls that have been installed (in some cases sunk into concrete or welded into stanchions) in the barn is a very important indicator for the number of cows that barn can safely and humanely hold, although it is not necessarily a 1:1 relationship. PVF has failed to provide definitive evidence of the specific numbers of stalls presently located within the

expanded Lumbra barn or other indicia of the "actual design, layout, and construction" including a detail of whether the installed stalls are designed to house "mature dairy animals or cow/calf pairs." PVF has presented multiple estimated figures of the number of stalls that conflict with each other as well as with the number counted by AAFM staff on an inspection. This absence of determinative evidence drives our determination that we cannot grant summary judgment to PVF on this general issue prior to trial.

We have been perplexed by this lack of clear or understandable evidence since shortly after first reviewing the initial filings in this appeal. We cannot fathom how a barn expansion as substantial as the Lumbra barn could have been constructed and completed without a design or plan first detailed and finalized. We understood that PVF caused a survey of the completed barn to be prepared and disclosed to AAFM. In re Lumbra Farm MFO Denial, No. 58-5-19 Vtec slip op. at 2 (Vt. Super. Ct. Envtl. Div. Jul. 8, 2020) (Durkin, J.). We have searched for such a survey or plan in the exhibits that each party has submitted in support of or in opposition to their respective summary judgment motions. All we have found is what appears to be a copy of a portion of such survey or plan. We ask the parties to provide reference to an already-submitted exhibit if our search caused us to reach this conclusion by mistake. In the absence of a mistake, we are left to conclude that the parties have decided to not provide the Court with such discovery responses, or that the discovery responses do not provide the necessary detail to support a determination of the maximum number of mature dairy animals or cow/calf pairs that the Lumbra barn could now house, and that a trial is therefore necessary to resolve these critical factual issues.

AAFM's representations also fail to provide a sufficient level of specificity on the general question of the maximum number of mature dairy animals or cow/calf pairs that the Lumbra barn could currently house based on its existing internal design. As an alternative, AAFM offers a number of means by which the Court should determine the number of animals that the Lumbra Farm barn could be reconfigured to house in the future, given its gross square footage and size.

We are at a loss to understand the legal foundation for relying upon estimates of the barn's capacity at some future date. If making a space available for a certain use requires a costly and laborious reconfiguration of that space, we do not see how the space can be said to have been designed for that use. PVF has made a sufficient showing at this stage that reconfiguring the barn to house numbers of cattle within the estimates AAFM has provided would be laborious and costly—sufficient, at least to deny AAFM summary judgment that determining the number of cattle the barn was

designed to house largely without regard to its existing layout. Moreover, anticipating what number of stalls could be created by such renovations misses the mark, in our estimation, of what the applicable statute directs.

We are directed to determine whether the Lumbra barn is "designed to house more than 700 mature dairy animals [or] 1,000 cattle or cow/calf pairs, . . ." such that its owners/operators are required to secure an LFO permit. 6 V.S.A. § 4851(a). The very language employed here directs investigating what was done in the past. The word "designed" does not direct that we determine what could be accomplished in the future; it directs this Court to determine what has already been planned for the Lumbra barn. In a similar fashion, the statutory definition for an MFO directs this Court to determine whether the Lumbra barn "houses 200 to 699 mature dairy cows [or] 300 to 999 cattle or cow/calf pairs . . .." 6 V.S.A. § 4857(2). This word choice directs a determination of what is occurring in the present; it can in no way be the foundation for a definition of what may occur in the future.[11]

AAFM's focus on the number of cows a barn could potentially house in the future relates, at least in part, to a concern that farms could circumvent the requirements of an LFO permit by obtaining an MFO permit instead and subsequently increasing their operations. However, the very feature of the LFO permit law that the agency argues supports its interpretation of "designed to house" in fact suggests this concern is misplaced. As AAFM points out, the law contains a "construction" trigger and an "operation" trigger for when a farmer must seek an LFO permit. The construction trigger requires permitting at the phase of constructing or expanding a barn designed to house more than a certain number of animals. 6 V.S.A. § 4851(a). However, a farm owner also must apply for an LFO permit in order to "operate" a farm above those threshold number of animals. 6 V.S.A. § 4851(b). Thus, the statute is well designed to regulate the very scenario the agency says it is concerned about: If the owner of a very large barn that is nevertheless designed to hold below the threshold number of animals decides to reconfigure the barn to house a larger number of animals, that farm would still need an LFO permit before operating with the larger number of animals. *See* In re Mountain Top Inn & Resort, 2020 VT 57, ¶ 37, 212 Vt. 554 ("We consider the whole and every part of the statute . . . and avoid a construction that would render part of the statutory language superfluous") (internal citations and quotations omitted).

---

[11] For further discussion of the potential tension between the verbiage of the MFO and LFO definitions, *see infra* Section II.1.

It is for these reasons that we conclude that AAFM's assertion that we must look to the future barn capacities is not relevant as we embark upon a determination of whether the Lumbra Farm constitutes a medium or large farming operation. To the extent that AAFM is asserting that we should defer to its determination of what number of animals a reconfigured Lumbra barn could be designed to house, we disagree. For the following reasons, we conclude that case law precedent does not direct this Court to show deference to AAFM's calculations as presented when attempting to determined what the Lumbra barn was "<u>designed</u> to house." 6 V.S.A. § 4851(a) (emphasis added).

The parties provide detailed analysis of the related legal issue of what "deference" this Court should show to the AAFM determinations. AAFM's position is that, as a determination involving complex methodology pursuant to and involving interpretations of its own regulations and statutes it is charged with administering, it is owed deference by this Court to its interpretation and application of "designed to house" and its resulting conclusion as to the appropriate permit for the expanded Lumbra barn. Our analysis of this general legal issue follows.

The Court is charged with conducting its own de novo evidentiary hearing, assessing the credibility of witness testimony and other evidence, and rendering a decision, based upon an application of the applicable law to that credible evidence. V.C.E.C.P 5(g); 10 V.S.A. § 8504(h). However, [e]ven when conducting an evidentiary hearing, the court owes deference to agency interpretations of policy or terms . . .." <u>In re Korrow Real Estate, LLC</u>, 2018 VT 39, ¶ 20, 207 Vt. 274, 283.

Our Supreme Court has showed respect for a trial court's factual findings, even when the lower court has considered challenges to agency determinations, noting that the lower court's findings are generally reviewed for "'clear error,' but [that] 'substantial deference' is given to [an agency's] determinations within its 'area of expertise.'" <u>Plum Creek Maine Timberlands, LLC v. Vt. Dep't of Forests, Parks, & Rec., et. al.</u>, 2016 VT 103, ¶ 24, 203 Vt. 197, *quoting in part* <u>Jones v. Department of Forest, Parks & Recreation</u>, 2004 VT 49, ¶ 7, 177 Vt. 81.

The Supreme Court in <u>Plum Creek</u> continued by noting,

> The basic framework for the standard of review is not altered simply because . . . there was a *de novo* evidentiary hearing in the superior court. Because the superior court has conducted a *de novo* hearing, as factfinder, the court's factual findings are reviewed for clear error. *As to questions of policy, however, agency determinations regarding the proper interpretation of policy or methodology within the agency's expertise are entitled to deference, even where there is a de novo hearing in the superior court.*

Id. at ¶ 25, *quoting in part* In re Appeals of ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 15–16, 196 Vt. 467 (emphasis added).

We are cautioned, however, that affording the proper deference to an agency does not mean that its decisions must be "rubber stamped," Plum Creek, 2016 VT 103, ¶ 31, as "the deference owed to agency determinations is not absolute." Korrow, 2018 VT 39, ¶ 21. Rather, "[a]n agency's authority to define terms within its statutory purview are to be given deference unless that authority is applied 'arbitrarily and capriciously' such that it 'give[s] rise to a violation of due process.'" Id., *quoting in part* In re Woodford Packers, Inc., 2003 VT 60, ¶ 17, 175 Vt. 579 (mem.). The presumption of deference to agency interpretation can be outweighed in certain circumstances, such as when there are "compelling indications of error" or the interpretation results in "unjust, unreasonable or absurd consequences." In re Conservation Law Foundation, 2018 VT 42, ¶ 16, 207 Vt. 209 (internal quotations omitted); In re Verburg, 159 Vt. 161, 165 (1992).

In this case, the Court finds clear indications of error in AAFM's interpretation and application of the "designed to house" standard. Understanding "designed to house" to mean a barn's potential to house LFO animal numbers, AAFM looked to the physical size of the expanded Lumbra barn as the key to the determination. Use of this method could have been reasonable if the St. Pierres had continued to refuse Agency officials the barn access that they requested. But in fact, the St. Pierres relented from their initial refusal and appear to have allowed Agency officials unfettered access to the exterior and interior of the Lumbra barn.

As the Court previously explained, the Agency's approach is unreasonable in the way that it disregards the existing physical layout or design of the expanded barn and the potential difficulties of reconfiguring it to achieve the potential maximum number produced by the Agency's calculation. It additionally fails to align with the structure of the LFO statute. By having a construction trigger and an operation trigger, the statute already prevents PVF or a future owner from increasing the number of animals past the LFO threshold without being obligated to obtain an LFO permit. It is not necessary for AAFM to base their determination on physical space out of a concern that other factors relevant to the number of animals in the barn could be changed after the receipt of an MFO permit. Deference is not appropriate here, since we conclude that the Agency's interpretation is inconsistent with the structure of the statute. *See* In re Stowe Cady Hill Solar, LLC, 2018 VT, ¶ 20, 206 Vt. 430, *citing* (Auer v. Robbins, 519 U.S. 452 (1997) (explaining the agency interpretation is "controlling unless plainly erroneous or inconsistent with the regulation")); Agency of Transportation v. Timberlake

Assocs., 2020 VT 73, ¶ 11, 213 Vt. 106 (internal quotation omitted) ("The words of a statute are not to be read in isolation, however, but rather in the context and structure of the statute as a whole").

By its primary argument, AAFM asserts that a determination of what number of animals a barn is "designed to house" should be reached through a simple mathematical equation of dividing the total square footage of a barn by an estimated area per cow, and that this was the methodology it used to reach the decision to deny the PVF's NOIC with the 2018 MFO GP. Specifically, when reviewing the NOIC, the Agency used an estimate of 75-100 square feet needed per mature dairy cow, derived from a four-page University of New Hampshire agricultural extension publication titled "Housing and Space Guidelines for Livestock." Exhibit H to AAFM's SUMF. The Agency admits to not having relied on these UNH guidelines in an MFO NOIC or LFO permit application prior to the St. Pierre's NOIC. In fact, Agency officials admitted to only reviewing the charts within in the last page of the UNH guidelines. Further, PVF has presented John Porter, one of the co-authors of that study as one of its experts. Professor Porter has made clear in deposition testimony that his study was prepared to assist local planning and zoning officials in New Hampshire who were considering residential applications for dairy farming, most often of only a small number of animals.

While the study does mention "full-time, part-time or back-yard farmers" and "commercial farms," id. at 1, 3, it is not at all clear from the evidence thus far presented that Professor Porter and his co-author were recommending that a "Dairy Cow" needed only 75–100 sq. ft. of total space, particularly within a much larger commercial dairy operation. In fact, Mr. Porter's testimony suggests that while the 75-100 square feet is a relatively constant estimate of the amount of enclosed living area required by an adult cow, pregnant cows may require more space. Porter Deposition at 44:13-45:8. Further, Mr. Porter testified that in a barn using a freestall layout, like the Lumbra Farm barn, the number of stalls is the factor most determinative of the barn's capacity to hold animals. Id. at 22:20-25.

The agency did not reach out to Mr. Porter or his co-author to gain insight as to whether their publication or their use of the figures in it constituted a reasonable method for determining the capacity of a commercial dairy barn. In fact, Agency officials admitted to not even reviewing all four pages of the UNH guidelines. It is for these reasons that we conclude that AAFM's calculation of the total number of mature dairy cows that could be housed in the Lumbra barn and its use of that figure to determine what the barn was designed to hold appears to be an unreasonable and "arbitrary and capricious" determination and therefore does not warrant the deference that AFM suggests.

Given that the parties have presented disputed material facts that could govern the ultimate issue of what number of animals the Lumbra barn is designed to house, and we decline to enter summary judgment on AAFM's behalf generally or on the legal issue of showing deference to its method of determining what number of animals the barn may house, we also decline to grant AAFM summary judgment on the facts and legal arguments presented to date. However, our determination to deny AAFM's summary judgment request does not, of course, require the Court to enter judgment in PVF's favor. We look forward to the party's evidentiary presentations at trial, so that we may assess the credibility of such evidence and render a determination on the ultimate question of what number of animals the Lumbra barn was designed to house.

## II. Legal Issues Raised by Appellant in its Statement of Questions

Each party has requested that the Court enter summary judgment in their respective favor on all legal issues presented in this appeal. However, the briefing thus far has paid scant attention to the specific legal issues presented by PVF in its Statement of Questions, as revised by the Court. Nonetheless, the Court will now review each of the Questions presented, so as to help the parties focus on the legal issues remaining to be resolved at trial.

1. PVF's Statement of Questions No. 1.

By its Question 1, PVF asks whether the Lumbra Farm satisfied the definition of a medium farm operation, as defined in 6 V.S.A. §4857(2). That statutory provision provides that a medium farming operation "is an AFO[12] which houses 200 to 699 mature dairy animals [or] 300 to 999 cattle or cow/calf pairs . . .." 6 V.S.A. §4857(2).

Given the dispute presented by the parties on the material fact of how many dairy animals, etc. may be housed in the Lumbra barn, we are required to answer Question 1 in the negative: the undisputed material facts to not direct a pre-trial determination that the Lumbra Farm constitutes a medium farm operation, as defined by the applicable statute. We must therefore conduct a trial to render a determination on Question 1.

Of particular interest is the difference in the verbs used to define medium and large farm operations. While § 4857(2) speaks to whether a medium farm facility "houses" animals, § 4851(a) speaks to the number of animals a large farm facility is "designed to house." Thus, it appears that the

---

[12] AFO stands for "animal feeding operation" and is defined at 6 V.S.A. § 4857(1) as a "facility where the livestock or domestic fowl have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period . . .."

statutory definition for an MFO posits what number of animals are presently "housed" in a facility (thus implying a present tense question), but the definition for an LFO uses the past tense verb of "designed to house."

Since we are presented at this juncture with a dispute as to material facts, we need not resolve whether these slight differences in verbiage would cause a different outcome when considering whether the Lumbra barn is an MFO or LFO facility, although we believe the clear overall intent of the statute is for the definitions to be harmonious, such that an operation must be categorized as either a small, medium, or large farm operation, and may not fit more than one category at any one time. *See* In re Estate of Cote, 2004 VT 17, ¶ 10, 176 Vt. 293 ("All relevant parts of the applicable statutory scheme are to be construed together to create, if possible, a harmonious whole"). We highlight this slight distinction to assist the parties in preparing for trial.

2. PVF's Statement of Questions No. 2:

By its Question 2, PVF asks whether the Lumbra Farm satisfies the definition of a medium farm pursuant to Subchapter III of the Rules established by AAFM for the regulation of medium and small fam operations.[13]

Subchapter III provides the Rules definitions pertaining to small and medium farms. Specifically, the terms "AFO" and "MFO" are defined by the Rules in a manner identical to the statutory provisions cited above. Thus, our response to Question 2 mirrors our response to Question 1: given the dispute presented by the parties on the material fact of how many dairy animals, etc. may be housed in the Lumbra barn, we are required to answer Question 2 in the negative: the undisputed material facts to not direct a pre-trial determination that the Lumbra Farm constitutes a medium farm operation, as defined by the applicable Rules. We must therefore conduct a trial to render a determination on Question 2.

3. PVF's Statement of Questions No. 3:

By its Question No. 3, PVF asks whether the term "designed to house" found in 6 V.S.A. § 4851 must be interpreted to mean the overall size of the structure, irrespective of the intended and actual use of the structure or number of animals present in the structure. For the reasons stated above

---

[13] These Rules are titled "Vermont Agency of Agriculture, Food & Markets, Medium and Small Farm Operations Rules for Issuance of General and Individual Permits" (effective April 16, 2006) and may be found at https://agriculture.vermont.gov/sites/agriculture/files/documents/Water_Quality/MFO_Rule.pdf.

and below, we answer this Question in the negative, thereby negating the need to address this Question at trial.

While the overall size of the Lumbra barn will be important to our trial determination of what it houses or is designed to house in terms of dairy animals, we reject the notion that this ultimate question can reliably be answered simply by dividing its total square footage by the 75–100 sq. ft. Prof. Porter recommends for the appropriate living area for a cow. The parties' filings make clear that a commercial dairy operation, particularly one of the size of the Lumbra Farm barn, requires areas of the barn be set aside for different functions, making a simple calculation dividing overall barn area by a single number inappropriate. Whether it be a "transition barn" or a conventional barn, a dairy barn of this size must have the necessary components of not just the animal stalls, but also one or more milking parlors, alley ways between the stalls and other areas, feed alleys, squeeze shoots, manure scraping areas, and general "dead" or other areas not necessarily dedicated to a specific use.[14] These components take up an undisclosed but significant portion of the Lumbra barn square footage. It would seem necessary to receive an itemization of their respective square footage, including the stall spaces, before we can accurately determine whether the Lumbra barn is designed to house animals in excess of the MFO numbers.

4. PVF's Statement of Questions No. 4:

By its Question No. 4, PVF asks whether the barn on the Lumbra Farm is designed to house more than 699 mature dairy animals and 300-999 cattle or cow/calf pairs such that a Large Farm Operation permit was required pursuant to 6 V.S.A. § 4851.

This Question is the first which asks whether the Lumbra Farm should be considered a large farm operation, thereby requiring an LFO permit. But we answer it by relying on the same rationale that guided us in considering whether the Lumbra barn was entitled to be considered an MFO: given the dispute presented by the parties on the material fact of how many dairy animals, etc. may be housed in the Lumbra barn, we are required to answer Question 4 by saying that we cannot make that determination at this pre-trial stage. Whether the Lumbra Farm is designed to house more than 699

---

[14] See Exhibit B (filed on April 12, 2021) to AAFM's Opposition to PVF's Cross-Motion for Summary Judgment, which shows a typical "freestall" design for a dairy barn. Exhibit B is titled "SIX ROW FREESTALL BARN DRIVE-THROUGH FEEDING – 336 STALLS", is authored by the Penn State Agricultural and Biological Engineering Department, and is dated June 12, 1997. Exhibit B includes a notation that it is "Sheet 1 of 3," but Exhibit B appears to only contain one page.

mature dairy animals or 3070-999 cattle or cow/calf pairs is unclear from the parties' presentations. We must therefore conduct a trial to render a determination on Question 4.

We wish to clarify here a legal question that has been in dispute regarding the lists of permitted animals in the MFO and LFO statutes. In its motion for summary judgment, PVF argues that the maximum quantities of different animals that a barn may be designed to house before becoming a large farm operation are conjunctive—i.e. that Lumbra Farm could be designed to house *both* 699 mature dairy cows *and* 999 cow-calf pairs without becoming a Large Farm Operation. PVF Cross-Motion at 8. AAFM disputes this assertion and correctly points out that it is a legal issue and not a question of fact. Agency Statement of Disputed Material Facts at ¶ 24. We agree with the Agency: these categories are clearly meant to be read as disjunctive.

There are thirteen different categories of animals listed and their total individual numbers, if read to be conjunctively, would be in excess of 352,700 individual animals. 6 V.S.A. §§ 4851(a), (b). While some of the categories themselves contain multiple disjuncts (e.g., "1,000 cattle or cow/calf pairs"; "10,000 sheep or lambs,") there are no prepositions between the different categories of animals up until the final "or." We therefore assume this "or" is meant to be distributed between each of the previous terms. The ordinary meaning of "or" is strictly disjunctive: This OR that, and not both. *See e.g.,* Judicial Watch, Inc. v. State, 2005 VT 108, ¶ 14, 179 Vt. 214 (finding the use of "or" in a statute to be disjunctive, suggesting an intent to create alternatives, under the normal rules of construction). PVF interprets it to be conjunctive, allowing both 699 mature dairy cows AND 999 cattle or calf cow pairs in a MFO barn. Extending PVF's logic would allow a single barn to house 325,684 animals (i.e.: one less than each animal maximum) and not require an LFO permit. We struggle to see how the legislature would have envisioned such a veritable Noah's ark as a medium farm operation. We will not adopt a statutory construction that produces absurd results, especially when the plain meaning supports the opposite construction. Wesco, Inc. v. Sorrell, 2004 VT 102, ¶ 14, 177 Vt. 287.

We admit that there may be some difficulties with applying this interpretation in a scenario where a barn contains animals from more than one of the thirteen categories, as is the case here, in quantities that fall below each individual category's maximum but may (or may not) exceed a single category's maximum if simply added together. Several possible means of resolving that interpretive problem occur to us. Without prejudging the correct interpretation, we raise this issue so that the parties may be prepared to discuss this legal issue at or prior to trial, to provide the Court with further insight.

5. PVF's Statement of Questions No. 5:

Lastly, by its Question No. 5, PVF asks whether PVF's manure spreading practices rise to the level of being a "common waste disposal system" as set forth in 6 V.S.A. § 4851(b) such that an LFO Permit was required. It appears that the parties are in agreement that PVF employees at some point spread manure collected from the dairy animals housed at the Lumbra barn on fields now used in connection with its other farm, the nearby Pleasant Valley Farm. The evidence thus far presented does not make clear whether this "offsite" manure spreading occurred more than once, nor does the evidence suggest that it continues today. PVF suggests that this manure spreading practice was a mistake supposedly made by employees who mistakenly believed that the field on which they spread the Lumbra manure was a field owned or operated in connection with the Lumbra Farm. PVF's assertion implies that the practice was a single mistaken occurrence.

AAFM asserts that this practice constitutes a "common waste disposal system" as that term is used in 6 V.S.A. § 4851(b). However, we are left to wonder whether, given AAFM's expertise in this area, it regards a single instance of spreading manure on another farm field to constitute a common waste disposal system. As noted above, we are also left to wonder whether this practice occurred more than once, and for how long it has or will continue. For those reasons, we cannot answer this Question and look forward to the parties' factual presentations and legal arguments at trial.

### Conclusion

In summary, we decline to render summary judgment on either party's behalf on Questions 1, 2, 4, and 5. As a consequence, we look forward to the parties' presentations at trial as to whether the Lumbra Farm constitutes a medium farm operation under the applicable statute (Question 1); whether it constitutes a medium farm operation under the applicable Rules (Question 2); whether it constitutes a large farm operation under the applicable statute (Question 4); and whether its manure spreading practices constitute a common waste disposal system, such that an LFO permit is required (Question 5). In response to Question 3, we enter summary judgment in PVF's favor, concluding that definition of the term "designed to house" may not solely rely upon a mathematical computation that divides the overall square footage of the structure by the estimated size of a stall appropriate for a mature dairy animal or cow/calf pairs.

We look forward to the parties' presentations at trial on the central questions for what numbers of animals the Lumbra Farm barn "houses" or is "designed to house", so that we may conclude whether that expanded barn constitutes a medium or large farm facility.

The Court requests that its Operations Manager schedule a pre-trial conference within the next 45 days, so that the Court may discuss the trial schedule with the parties. The Court also requests that the parties, prior to the next conference, discuss the wisdom of the Court conducting a site visit. The Court anticipates that a site visit would provide an appropriate context for the evidence to be received at trial, and we therefore look forward to the parties' respective opinions on this point.

Electronically signed at Newfane, Vermont on March 25, 2022, pursuant to V.R.E.F. 9(d).

Thomas S. Durkin, Superior Judge
Superior Court, Environmental Division